UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**PAUL J. MURPHY, Regional Director of the
Third Region of the National Labor Relations
Board, for and on behalf of the NATIONAL
LABOR RELATIONS BOARD,**

                               **Petitioner,**
      v.                                                     3:17-MC-0004

**CAYUGA MEDICAL CENTER OF ITHACA,**

                               **Respondent.**
_____

**THOMAS J. McAVOY,
Senior United States District Judge**

## DECISION & ORDER

Before the Court is Petitioner's request for a temporary injunction pursuant to Section 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §160(j), requiring reinstatement of two employees pending final administrative disposition of unfair labor practices charges brought against the respondent. See dkt. # 1. The parties have briefed the issue and the Court has determined to decide the matter on the administrative record without a hearing.[1]

---

[1] The Petitioner also moved to have the Court decide the issue on the administrative record. See dkt. # 2. The Court asked for briefing on this issue. The Respondent argued that the Court could decide the issue on the record, but contended that the record was insufficiently developed for the Court to make a proper conclusion on the injunction. As this is an argument that goes to the merits of granting the Section 10(j) injunction, the Court will consider Respondent's arguments in that context but grant the Petitioner's motion. The Petitioner also moves to shorten time and for an expedited hearing on the Petition. See dkt. # 3. As the Court is now deciding the Petition, the Court will deny that motion as moot.

1

## I. BACKGROUND

This case concerns ongoing disputes surrounding a union organizing campaign led by 1199 SEIU United Healthcare Workers East (the "Union") at Cayuga Medical Center in Ithaca, New York. The Union has been seeking since early 2015 to organize registered nurses at the facility. Petitioner, Regional Director for the National Labor Relations Board ("NLRB"), alleges that Respondent Cayuga Medical Center of Ithaca has engaged in a vigorous campaign, "replete with unfair labor practices," to prevent the Union from gaining a foothold at the Medical Center. The Union has filed numerous unfair labor practices charges with the NLRB, which the Petitioner investigated, found meritorious, and brought to a hearing before an Administrative Law Judge. On October 28, 2016, the ALJ issued a decision that found that the Respondent violated the NLRA in numerous ways, including a finding that Anne Marshall, one of the nurses who is the subject of the instant petition, had been improperly targeted for discipline and demotion because of her union activities. See Exh. I to Petition for Preliminary Injunction, dkt. # 1-3.

On September 29, 2016, the Union filed additional unfair labor practices charges against the Respondent, alleging that on September 23, 2016, Respondent violated Section 8(a)(3) by disciplining two nurses, Loran Lamb and Anne Marshall, in retaliation for their union activities. See Exh. A to Petition, dkt. # 1-1. The Complaint alleged that Respondent had suspended Lamb and revoked her email access and that Respondent had threatened discipline and revoked the email access of Marshall. Id. The Union Amended the charge on November 22, 2016 to allege that Marshal was suspended in retaliation for her union activities on October 4, 2016. See Exh. B to Petition, dkt. # 1-1. Another charge, filed on October 12, 2016, alleged that Respondent had been violating

2

Section 8(a) of the NLRA since July 2016 by interfering, restraining and coercing employees from exercising their rights under the Act. See Exh. C to Petition, dkt. # 1-1. The Union alleged that the Respondent had violated the act by "discriminatorily enforcing its bulletin board policy, . . . engaging in surveillance of union activity, . . . forcibly removing an employee from a conversation with a union organizer, and . . . requiring employees to wear anti-union buttons." Id.

On November 29, 2016, the Petitioner issued an order consolidating the above cases, setting forth a consolidated complaint, and providing notice of a hearing. See Exh. D to Petition, dkt. # 1-1. The complaint alleged that in July 2016, the Respondent "prohibited employees from posting union literature around the facility while permitting employees to post other literature." Id. The complaint also alleged that on September 21, 2016, Respondent suspended Loran Lamb and on October 5, 2016, Respondent terminated her employment. Id. The complaint further alleged that Respondent suspended Anne Marshall on October 5, 2016, and terminated her employment on October 6, 2016. Id. The complaint alleges that Respondent engaged in these employment actions "because the named employees of Respondent formed, joined or assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities." Id. Such conduct allegedly violated Section 8(a)(1) and 8(a)(3) of the NLRA. Id. The NLRB also ordered a response and scheduled a hearing on the charges to take place before an ALJ on January 9, 2017. The parties agree that such hearings are presently ongoing.

On February 21, 2017, the Regional Director filed the instant Petition, which seeks a temporary injunction from the Court reinstating Lamb and Marshall. Petitioner contends

that Respondent has violated the NLRA by preventing the Union from distributing literature at the workplace and by firing the two nurses in retaliation for their union activity. Respondent denies these allegations and insists that the matter provides no basis for injunctive relief.

## II. LEGAL STANDARD

Petitioner seeks an injunction pursuant to Section 10(j) of the NLRA, 29 U.S.C. § 160(j). That section permits the NLRB, after filing a complaint alleging unfair labor practices, "to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts, for appropriate relief or restraining order." 29 U.S.C. § 160(j). "The courts have generally issued section 10(j) injunctions only to preserve the status quo while the parties are awaiting the resolution of their basic dispute by the Board." McLeod v. General Elec. Co., 366 F.3d 847, 850 (2d Cir. 1966). A court considering a request for an injunction under Section 10(j) must apply a two-part test. Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd., 247 F.3d 360, 364 (2d Cir. 2001). "First, the court must find reasonable cause to believe that unfair labor practices have been committed." Id. at 364-65. "Second, the court must find that the requested relief is just and proper." Id. at 365. In applying the first element, "'the court need not make a final determination that the conduct in question is an unfair labor practice. It need find only reasonable cause to support such a conclusion.'" Id. at 333 (quoting Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995)). The district court is to defer to the NLRB's "judgment" and "should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." Id. (internal citations omitted). As to the

4

second element, "'injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo.'" Paulsen v. Remington Lodging & Hospitality, LLC, 773 F.3d 462, 469 (2d Cir. 2014) (quoting Kreisberg ex rel. N.L.R.B. v. HealthBridge, 732 F.3d 131, 144 (2d Cir. 2013)). "The principal purpose of a § 10(j) injunction is to guard against harm to the collective bargaining rights of employees." Id.

**III. ANALYSIS**

**A. Factual Background**[2]

The Petitioner alleges that the campaign to organize nurses at the Cayuga Medical Center began in early 2015, growing out of nurses' frustration with persistent staffing shortages. Anne Marshall, a registered nurse employed by Respondent, served as an early and vocal advocate for the Union. Loran Lamb, also a registered nurse, joined Marshall in this public support. Both worked in the intensive care unit ("ICU"). According to the Petition, both nurses had an "unblemished" professional record and reputation before their involvement with the Union.

The earlier decision by an ALJ found, Petitioner points out, that Respondent engaged in unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3). The ALJ found that "the net result of [Marshall's] union activity and her protected and concerted efforts to challenge the hospital on staffing issues was an employer that engaged in unlawfuly motivated and discriminatory targeting of her, which led directly to the adverse

---

[2] These facts are taken from exhibits and factual narrative in the Petition, as well as the exhibits and affidavits provided by Respondent in opposing the request for a temporary injunction. The Court uses this evidence because of the deference to the Regional Director's findings required in a 10(j) proceeding. The Court's role here is not to resolve factual disputes, but to determine whether reasonable cause exists to support the Regional Director's position based on the evidence provided.

5

actions taken against her by the hospital." Exh. I to Petition, dkt. # 1-1, at 1. This decision has been appealed to the NLRB and is currently pending. Marshall and Lamb continued their organizing efforts even after the hearings concerning unfair labor practices. Marshall periodically maintained an information table in the hospital's cafeteria, canvassed employees in the parking lot, wore a union button, sent emails about the union, and put signs on her car. Lamb advocated for increased staffing, wore a union button on her work clothes, and attended a hearing on the earlier charges concerning Marshall. Respondent was aware of these activities, and particularly noticed Marshall's work; an internal email concerning responses to the organizing effort included a discussion of the Respondent's "Union or Anne Marshall Focus." The Respondent also allegedly removed literature Marshall posted from a bulletin board.

On September 11, 2016, Lamb and Marshall, working in the ICU, violated the Respondent's blood transfusion policy. That policy requires that two nurses check that the blood for designated transfusion matches the doctor's order and the patient's needs two times, first at the nurses' station and then at the patient's bedside. All parties agree that only Marshall performed the check at the patient's bedside, even though both nurses signed a form that appeared as if both had been at the patient's bedside. The patient complained to the charge nurse on duty, and an investigation ensued. Respondent claims that this conduct violated hospital policy, endangered the patient, and amounted to falsifying medical records. The Petitioner, citing to confidential statements made to the Board from other ICU nurses, contends that Lamb and Marshall engaged in a practice commonly accepted on the unit. Of six ICU nurses questioned, all six testified that they

6

checked blood at the nurses' station, and only one nurse entered the patient's room to administer the transfusion. Petitioner further contends these nurses told the administrator charged with investigating the September 11 incident that they frequently followed the procedure Marshall and Lamb used. This investigator, Petitioner contends, encouraged the nurses to testify that they always followed the written procedures.

Respondent suspended and then terminated both Marshall and Lamb. Respondent's investigators interviewed Lamb on September 21, 2016. Lamb admitted that she knew the transfusion policy and had violated it on September 11 by not joining Marshall in the patient's room. Respondent suspended Lamb after this meeting. Marshall was on vacation when this interview occurred, and Respondent suspended Lamb without interviewing Marshall. Petitioner contends that the decision to suspend and then terminate Marshall was made before any interview occurred, pointing to a report on the incident prepared by Respondent's Director of Patient Services and a draft letter designed to be sent to employees, physicians and volunteers about the incident. Both of those documents concluded that Marshall had engaged in misconduct even before the Respondent had spoken to her about the events in question. Indeed, the draft letter to employees, Petitioner alleges, included a statement that the nurses had been fired. Petitioner asserts that these draft documents are "persuasive evidence that the investigation had a foregone conclusion considering that the nurses interviewed" by investigators "said they routinely perform blood checks at the nurses' station; the investigation was ostensibly ongoing; and Marshall had not yet been suspended, terminated or even interviewed about the incident."

7

After interviewing Marshall when she returned from vacation on October 4, 2016, Respondent suspended her. Respondent terminated Lamb on October 5 and Marshall on October 6. Both resigned in lieu of their discharge. Respondent sent employees an email explaining the terminations on October 7; this email was nearly identical to the draft circulated before the Respondent interviewed Marshall. The Petitioner contends that:

> Based on the credible testimony of witnesses and documentary evidence . . . the evidence demonstrates that Marshall and Lamb failed to follow a policy that Respondent had never before enforced; Respondent knew other nurses failed to follow that policy; Respondent conducted an investigation with a predetermined outcome into Marshall and Lamb's violation of the policy; and Respondent nonetheless suspended and terminated Marshall and Lamb for failing to follow this policy.

Petitioner's Brief, dkt. # 1-5, at 14.

Petitioner points to other incidents where nurses failed to follow the transfusion policy and did not receive the same discipline as Marshall and Lamb. These incidents could be seen as more egregious than the one on September 11, 2016, since the patients in these cases suffered potentially adverse medical reactions to the incidents. In both cases, the nurses who violated the transfusion policies faced no serious discipline, but instead were forced to review the transfusion policy with Respondent's staff. Likewise, nurses who violated policies and protocols in other areas received instruction rather than discipline. Respondent had disciplined some nurses who failed to follow protocols, but under different circumstances. One nurse was terminated, for example, after failing to follow blood protocols, but that nurse had also diverted narcotics. Other nurses involved in the incident were simply "debriefed" on the matter.

Petitioner also contends that Respondent's firing of Lamb and Marshall has undermined the Union's organizing efforts. Petitioner has produced affidavits from nurses

8

Respondent still employs who attest to a chilling affect on organizing since the terminations.  See Exhs. F-G, H, J, K, to Petition, dkt. #s 1-2, 1-4, to Petition.  Jacqueline Thompson's affidavit, for instance, avers that "[t]he Union and its campaing at the Hospital were regular topic[s] of conversation amongst employees" with whom Thompson worked "before Lamb and Marshall were fired."  Thompson Affidavit, Exh. F to Petition, dkt. # 1-2, at ¶3.  Marshall had worn pro-Union buttons, passed out literature, and sent emails about the Union through the Respondent's email system before her termination.  Id. at ¶ 4.  After Marshall's firing, Thompson had "not seen any employee engage in any of these activities," and no other employee had contacted her "regarding the continuation of the organizing effort."  Id.  According to Thompson, "[t]he Union organizing campaign is dead in the water[.]"  Id. at ¶ 6.  Thompson points to two reasons for this demise: no other employee wants to lead the organizing effort and "general sense of fear" has followed "Marshall and Lamb's terminations."  Id.  Thompson herself is not interested in taking a lead in the organizing campaign for fear of being fired, and because "I feel as though I would be targeted by hospital management if I attempted to lead the union campaign, and I do not want that to occur."  Id.  Other affidavits similarly find a decline in organizing, less discussion of the Union, and a decrease in the willingness of employees to be identified with the Union since the firings.  See Exh. G at ¶ 8; Exh. H at ¶ 6, Exh. J at ¶¶ 5-8; Exh. K at ¶¶ 7-9.

### B.     Reasonable Cause

The Regional Director argues that Respondent has violated sections 8(a)(1) and 8(a)(3) of the NLRA.  The NLRA provides that "[I]t shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights

9

guaranteed in section 7" of the NLRA and "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1), (a)(3). Section 7 of the NLRA establishes, in relevant part, that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other protected activities for their purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. "An employer violates section 8(a)(3) by firing an employee for engaging in union activity." New York University Medical Center v. N.L.R.B., 156 F.3d 405, 411 (2d Cir. 1998). Such conduct also violates section 8(a)(1). Torrington Extend-A-Care Employee Ass'n v. N.L.R.B., 17 F.3d 580, 591 (2d Cir. 1994). In such cases, "the determinative issue is the employer's motivation." Id. First, the NLRB must be persuaded "that anti-union animus contributed to the employer's decision." Id. If this prima facie burden is met, "the burden shifts to the employer to demonstrate by a preponderance of the evidence that the same employment action would have been taken in the absence of the protected conduct." Id.

The Respondent argues that the Petitioner has not demonstrated reasonable cause. The Respondent contends that the firing of Lamb and Marshall was unrelated to their union activities. Instead, the nurses were terminated because of "flagrant misconduct and disregard for patient safety." Both nurses, after all, are the subject of a State investigation for the activities that led to their termination, and Cayuga Medical Center regularly fires employees who falisfy medical records. Moreover, Respondent argues, Petitioner has not provided any documentary evidence to support its claims for that Respondent committed unfair labor practices. Respondent further argues that the

10

evidence it supplied will substantiate that the terminations were justified and not motivated by the nurses' union activity. Injunctive relief is inappropriate here, Respondent argues, because the administrative record has not been fully developed.

The problem with the Respondent's position is that the Court's role here is not to make credibility determinations or weigh the value of the evidence supporting CMC's decision to terminate the nurses against that supporting the Petitioner's position. Instead, the Court is to defer to the NLRB's findings unless those findings are "fatally flawed." Hoffman, 79 F.3d at 333. Petitioner "is not required to show that an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by the Court of Appeals.'" Kaynard v. Mego Corp., 633 F.2d 1026, 1033 (2d Cir. 1980) (quoting McLeod v. Business Machine and Office Appliance Mechanics Conference Board, 300 F.2d 237, 242 n.17 (2d Cir. 1962)). Even where disputed facts exist, "the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief." Id.

The Court finds that the facts presented to the Court, giving the Petitioner the benefit of the doubt, create reasonable cause to believe that the Court of Appeals will enforce a finding by the NLRB of unfair labor practices in relation to the firing of Nurses Lamb and Marshall. The Petitioner has put forth evidence, as related above, that creates reasonable cause to believe that Respondent terminated the nurses because of their union activity. The Regional Director has presented evidence that indicates that the actions for which Respondent allegedly fired Lamb and Marshall–failing to both be present in the room when a transaction occurred and failing to document the transfusion

11

truthfully–were actions that did not lead to the firing of other employees who engaged in the same behavior. The Regional Director has also presented evidence that makes it reasonably likely that Respondent was motivated by anti-union animus for the firing. Beyond the extreme action taken against nurses with stellar work records who were involved vociferously in the union campaign, the Petitioner has also provided evidence that an ALJ has already found that Respondent acted out of anti-union animus in previously disciplinary actions against Marshall. Courts are permitted to use such decisions in evaluating a 10(j) motion, since "the ALJ's factual and legal determinations suppy a useful benchmark against which the Director's prospects of success may be weighed." Bloedorn v. Francisco Foods, Inc., 276 F.3d 270, 288 (2d Cir. 2001). Evaluating the Regional Director's position from the deferential perspective required in this proceeding, the Court finds that the Petitioner's position is not fatally flawed.

Respondent's arguments simply quarrel with the facts, asserting that the stated reasons for the decision to fire the nurses were the real ones and pointing out that a failure to follow the stated transfusion policies could endanger a patient. Whatever the merits of those arguments, they can be raised before the ALJ and the Court of Appeals if necessary. At this point, the Court finds "reasonable cause to believe that the respondent ha[s] committed unfair labor practices under section 8(a)(1) and 8(a)(3) of the Act." Seeler v. Trading Port, Inc., 517 F.2d 33, 36 (2d Cir. 1975). Even when "there are disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt[.]" Id. at 36-37. The Court therefore finds that the first part of the test has been met.

**C.     Just and Proper Injunctive Relief**

Respondent argues that the Court is to "apply the same general equitable principles

12

that ordinarily apply in determining the propriety of injunctive relief, including irreparable harm, balance of equities, and public interest." Citing Ahearn v. House of Good Samaritan, 884 F.Supp. 654, 661 (N.D.N.Y. 1995).  Using these standard, Respondent argues, the Court must deny relief because "there is no threat of remedial failure" and the balance of the equities weigh against granting an injunction.  Of particular concern, Respondent insists, is the threat to public safety and the welfare of CMC patients that would come from reinstating two nurses found to have endangered a patient during a blood transfusion.  In any case, a union organizer still is in place at CMC, and any alleged threat to the union organizing campaign is vastly overstated.  Finally, the Petitioner waited several months to seek equitable relief after the nurses' termination, and this action undermines any claim that a speedy decision on reinstatement is necessary.

The Respondent misstates the law in this area.  The Second Circuit Court of Appeals recently explained that, while "the 'just and proper'" element "of the 10(j) injunctive relief standard for labor disputes incorporates elements of the four-part standard for preliminary injunctions that applies in other contexts," courts evaluating a Section 10(j) request do not need to apply that standard.  Kreisberg, 732 F.3d at 141.  In reaching this conclusion, the court noted that, unlike a Section 10(j) proceeding, an ordinary "preliminary injunction involves no preliminary determination by a government enforcement agency, is resolved on the merits by the district court, and is issued pursuant to the court's equitable power rather than a specific statute."  Id.  Under Section 10(j), however, "petitions come from a unique statutory scheme that requires (1) deference to the NLRB, which resolves the underlying unfair labor practice complaint on the merits and makes an initial determination, prior to the filing of a petition, to file such a complaint, as well as (2)

13

speedy resolution to preserve the status quo in a labor dispute[.]" Id. The Court will thus apply the "just and proper" standard as articulated by courts in reference to Section 10(j), rather than to the general standards courts use in deciding on equitable relief. Under that standard, "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." Hoffman, 247 F.3d at 368. The proper "'test for whether harm is irreparable in the context of § 10(j) . . . cases is whether the employees' collective bargaining rights may be undermined by the . . . [asserted] unfair labor practices and whether any further delay may impair or undermine such bargaining in the future.'" Kreisberg, 732 F.3d at 142 (quoting Hoffman, 247 F.3d at 369). The status quo that should be preserved "is that which was in existence before the unfair labor practice occurred." Id. at 143 (internal quotations omitted).

The Second part of the test is also satisfied. Here, the alleged unfair labor practice involves firing employees for their participation in the organization drive. Firing employees for wanting to join a union surely undermines collective bargaining rights and has the effect of discouraging future organizing. Petitioner has provided evidence, cited above, to this effect. Multiple affidavits from workers at Cayuga Medical Center indicate that the firings have created a fearfulness among nurses that any connection with the Union could cause them to be fired. Attendance at meetings and participation in unionizing events has been reduced, and the affiants indicate that the reduction is directly related to fear for employment. In this context, "the rights of improperly discharged employees take priority over the rights of those hired to replace them." Paulsen, 773 F.3d at 469. Since "the main focus of a § 10(j) analysis should be on harm to organizational efforts, . . . time [is] of the essence in reinstating fired employees." Id. A delay in reinstatement "is a significant

14

concern because the absence of employees who support a union can quickly extinguish organizational efforts and reinforce fears within the workforce concerning the consequences of supporting union activity." Id. Thus, an injunction is just and proper under the circumstances.[3]

The Court will therefore grant the Section 10(j) injunction as requested.

---

[3]Respondent contends that the delay between the firing and filing of the instant petition demonstrate that such relief is unnecessary. The cases Respondent cites in support of this proposition are inapposite and unpersuasive. In Seeler v. H.G. Page & Sons, Inc., 540 F.Supp. 77 (S.D.N.Y. 1982), for instance, the court denied a request for a 10(j) injunction because of the Regional Director's four-month delay in seeking it. The court found that injunction relief is unavailable "where the Board itself does not treat the ongoing violations with urgency." Id. at 79. The injunction sought in Seeler largely sought reinstatement of employees who had struck to protest unfair labor practices like firing a union organizer and threatening to shut the company down if the union won a collective bargaining election. Id. at 78. By the time the Board sought the injunction, however, "most, if not all, of the striking employees ha[d] been offered the opportunity to return to work." Id. The court found that these facts, in addition to the delay in filing, belied the Board's argument that an injunction was necessary to prevent "erosion" of the union's position. Id. at 79. Congress enacted Section 10(j), after all, "to prevent violators of the Act from accomplishing 'their unlawful objective' pending adjudication by an administrative law judge." Id. As explained above, the alleged unlawful firings, undertaken to slow the organizing drive, have not been rectified and have served to promote an unlawful objective of quieting organization efforts while decision by an ALJ is pending. Silverman v. Local 3, Intern. Broth. of Elec. Workers, AFL-CIO, 634 F.Supp. 671 (S.D.N.Y. 1986), involved section 10(l), not section 10(j) of the NLRA; the case involved a union engaging in a secondary boycott. Id. at 672. Moreover, at the time the Board sought an injunction, the Board had not filed a complaint against the union and had not provided the court with an administrative record. Id. Here, the case involves a different section of the statute, an administrative record has been created at least in part, and, as the Court has found, irreparable harm would come to the Union from failing to issue a temporary injunction. The delay complained of by the court in Moore-Duncan v .Traction Wholesale Center Co., Inc., 1997 WL 792909 (E.D.Pa. Dec. 19, 1997), at six months, was months longer than the delay in this case. In any case, the Court finds that an injunction here fits the statutory purpose as described in that case: "because of the protracted nature of the administrative proceedings, absent the relief provided for in 10(j), a company could accomplish its goal of preventing unionization through the use of unlawful means before a final order restraining such activity. This would, of course, render the order ineffective for all practical purposes." Id. at *1.

**IV. CONCLUSION**

For the reasons stated above, the Petitioner's motion for preliminary injunction, dkt. # 1, is hereby GRANTED, as follows:

1. The Respondent, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, pending final disposition of the matters involved here pending before the National Labor Relations Board, are hereby ORDERED to:

    a. Within five (5) days of the date of this Order, the Respondent is hereby ordered to offer reinstatement to Anne Marshall to her former position with her seniority and all other rights and privileges;

    b. Within five (5) days of the date of this order, the Respondent is hereby ordered to offer reinstatement to Loran Lamb to her former position with her seniority and all other rights and privileges;

    c. Post copies of this Order at the Respondent's Ithaca, New York facility where notices to employees are customarily posted, those postings to be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; all employees shall have free and unrestricted access to said notices;

    d. Grant to agents of the Board reasonable access to Respondent's Ithaca, New York facility to monitor compliance with this posting requirement;

    e. Within seven (7) days of the date of this order, hold a mandatory

        meeting scheduled to ensure the widest possible attendance, during work time, and have a responsible official for Respondent, in the presence of a Board agent, or at Respondent's option, a Board agent, in the presence of the Respondent's official, read the Conclusion to this Order and notice to employees; and

    f.    Within twenty-one (21) days of the issuance of this Order, file with the District Court and submit a copy to the Regional Director of Region Three of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of this decree, including how it has posted the documents required by the Court's decree.

The Petitioner's motion to determine the Petition on the basis of the administrative record, dkt. # 2, is hereby GRANTED. The Petitioner's motion to shorten time and for an expedited hearing, dkt. # 3, is hereby DENIED as moot.

**IT IS SO ORDERED**

DATED: March 22, 2017

_____
Thomas J. McAvoy
Senior, U.S. District Judge